**MISSOURI–KANSAS & T. R. CO. OF TEXAS et al. v. RAILROAD COMMISSION OF TEXAS et al. (No. 7134.)**

Court of Civil Appeals of Texas. Austin. Feb. 8, 1928.

Rehearing Denied Feb. 29, 1928.

**1. Carriers ⊛⇒20(3)—Rates charged, not having been attacked, were binding, and their collection could not violate statute or provision for which penalty was authorized (Rev. St. 1911, arts. 6654, 6657, 6658, 6664, 6670).**

Where rates charged by railroads for transportation of casing-head gasoline between intrastate points were fixed by the Railroad Commission under Rev. St. 1911, art. 6654, and had not been questioned in a direct proceeding under articles 6657, 6658, to determine their reasonableness, they were binding both on carriers and shippers, and their collection was not a violation of article 6670, defining unjust discrimination and providing penalty therefor, for which carriers could be penalized by the Railroad Commission under article 6664.

**2. Carriers ⊛⇒20(I)—Unless carriers have done or omitted something in violation of law, Railroad Commission is without authority to act in collection of penalty (Rev. St. 1911, art. 6664).**

Unless carriers, in collection of transportation charges, have done or omitted something, the doing or omission of which would be a violation of a law prescribing a penalty, Railroad Commission is without authority to act under Rev. St. 1911, art. 6664, to collect penalty.

**3. Carriers ⊛⇒20(10)—Party complaining of discrimination must point out specific thing done or omitted before complaint has standing before Railroad Commission (Rev. St. 1911, art. 6664).**

In making a complaint of unjust discrimination before the Railroad Commission under Rev. St. 1911, art. 6664, complainant must point out specific thing done or omitted by carrier which constitutes a violation of law prescribing a penalty before complaint has any standing before the Railroad Commission.

**4. Carriers ⊛⇒19—Railroad Commission was without authority under statute to determine that rates fixed by it were discriminatory and amount of damage shippers were occasioned thereby (Rev. St. 1911, art. 6664).**

Since Rev. St. 1911, art. 6664, presupposes existing violation of some law prescribing pen-

alty which the Railroad Commission under the statute has authority and duty to investigate, the commission is not empowered thereby to determine that rates made by it were discriminatory and amount of damages to shipper occasioned by such discrimination.

**5. Carriers ⊛⇒12(I)—Rate making is legislative function, which operates prospectively.**

Rate making is essentially a legislative function, and operates prospectively.

**6. Carriers ⊛⇒18(I)—Rates made by Railroad Commission are subject to review and determination whether they are unreasonable or unjust (Rev. St. 1911, arts. 6657, 6658).**

Acts of the Railroad Commission in making a rate have force and effect of statutes, and are subject to review to extent only that statutes of same import are so subject, with additional power under Rev. St. 1911, arts. 6657, 6658, conferred on courts to determine whether a rate so made is unreasonable or unjust to party complaining.

**7. Carriers ⊛⇒18(I)—Inquiry as to justness, reasonableness, or discriminatory effect of rate as affects reimbursement constitutes judicial inquiry not within authority of Railroad Commission.**

Inquiry as to the justness, reasonableness, or discriminatory effect of an existing freight rate for purpose of reimbursement for charges theretofore paid under it constitutes a judicial inquiry, and is not within authority of the Railroad Commission.

**8. Carriers ⊛⇒12(I)—Rates, to be effective under statute, must be made by the Railroad Commission, and are operative only by force of its orders (Rev. St. 1911, art. 6654).**

Rates for transportation by carriers, to be effective, must be made by the Railroad Commission under Rev. St. 1911, art. 6654, and are inoperative other than by force of its orders.

**9. Carriers ⊛⇒30—Interstate rates, fixed by tariffs filed with Interstate Commerce Commission, were binding until successfully attacked in proceeding before Interstate Commerce Commission.**

Rates for interstate shipments of casing-head gasoline, being fixed by tariffs filed with the Interstate Commerce Commission by carriers, were binding until successfully attacked in a proceeding before the Interstate Commerce Commission.

Appeal from District Court, Travis County; Geo. Calhoun, Judge.

Suit by the Missouri-Kansas & Texas Railroad Company of Texas and others against the Railroad Commission of Texas and others, in which the Simms Oil Company filed a cross-action against plaintiffs. From a judgment sustaining a general demurrer to plaintiffs' petition and sustaining a general demurrer to the cross-action, plaintiffs and cross-plaintiff appeal independently. Judgment sustaining general demurrer to petition and dismissing case reversed, and cause,

---

other than on the cross-action, remanded for further proceedings.

See, also, 3 S.W.(2d) 497.

A. H. McKnight, of Dallas, G. B. Ross, of Galveston, T. D. Gresham, of Dallas, Fred L. Wallace, Goree, Odell & Allen, and N. H. Lessiter, all of Fort Worth, and N. A. Stedman, of Austin, for appellants.

Callaway & Reed, of Dallas, and James W. Finley, of Chanute, Kan., and Warren T. Spies, of Bartlesville, Okl., and Phillips, Trammell & Chizum, of Fort Worth, for Simms Oil Co., and Producers' Refining Co.

McCLENDON, C. J. Appellants, a number of railroad corporations, brought this suit against the Railroad Commission and its members to enjoin the enforcement of a commission order awarding to Clayton Oil & Refining Company $15,137.73, and to Producers' Refining Company $25,005.48, as reparation for unjust discrimination in rates on casing-head gasoline shipped prior to March 10, 1923, from various producing points in Texas to the refineries of the oil companies located at Harrys and Gainesville, Tex. The order was made pursuant to complaints of the oil companies filed with the commission under article 6664, Revised Statutes of 1911. The Simms Oil Company, having acquired the rights of the Clayton and Producers' Companies, filed a cross-action against the railroad companies for the amount of the award. The trial court sustained a general demurrer to the railroad companies' petition for injunction, and a general demurrer to the cross-action of the oil company. The railroad companies and the oil company have filed independent appeals.

The facts and conclusions upon which the commission order was based are set forth in the following quotation from the opinion of the commission:

"Without going into the history of the rates involved in this proceeding, it may be stated that the maximum intrastate rate on casing-head gasoline between points in Texas from July 1, 1921, to May 20, 1922, was 44 cents per 100 pounds, and 39½ cents per 100 pounds from May 20, 1922, to March 10, 1923. These rates reached their maximum amount at 120 miles single line and 90 miles joint line haul. The shipments complained of in this proceeding moved from producing points at Frankell, Burkburnett, Electra, and Iowa Park, to the respective refineries of the plaintiffs at Gainesville, and Harrys, Tex.; the same maximum rates applying from these points of origin to Shreveport, Louisiana, until July 22, 1921, when the defendants voluntarily reduced the Shreveport rate from 44 cents to 25 cents per 100 pounds, but no change was made in the intrastate rate from these points of origin to Gainesville and Harrys. From Burkburnett to Gainesville is 103 miles; to Harrys 154.6 miles, to Wichita Falls 14 miles, and to Shreveport 345 miles. From Electra to Gainesville it is 115.2 miles; to Harrys 171.8 miles; to Wichita Falls 26.3

miles; and to Shreveport 357 miles. From Breckenridge to Gainesville is 177.9 miles; to Harrys 122.9 miles; to Wichita Falls 103.1 miles; and to Shreveport 348.9 miles. From Iowa Park to Gainesville it is 99.7 miles; to Harrys 152.7 miles; to Wichita Falls 10.8 miles; and to Shreveport 341.8 miles. From all of these points of origin to Gainesville and Harrys the rate was 39½ cents per 100 pounds after May 20, 1922. The scale of rates to Shreveport was likewise 39½ cents per 100 pounds. The regular scale of rates between Wichita Falls and Burkburnett provided 17 cents per 100 pounds, but the defendants, upon their own application, were authorized to make a special rate of 11 cents per 100 pounds, effective May 20, 1922. Between Wichita Falls and Electra, the regular scale of rate provided 17 cents per 100 pounds, but, effective July 28, 1922, the defendants were authorized to make a special rate of 10 cents per 100 pounds. From Breckenridge to Wichita Falls the regular scale provided 36½ cents per 100 pounds, but, effective August 19, 1922, defendants were authorized to make a special rate of 15 cents per 100 pounds. Thus it will be seen that, while the plaintiffs in this proceeding were compelled to pay the maximum scale rate of 39½ cents per 100 pounds, the defendants granted to their competitors at Wichita Falls and Shreveport materially reduced rates from the same points of origin—rates materially below the scale of rates prescribed by this commission for intrastate traffic in Texas. While the regular scale of rates provided a rate of 39½ cents from the points of origin in question to Shreveport, the carriers voluntarily reduced that rate, effective July 22, 1921, to a maximum rate of 25 cents per 100 pounds, from all of these points to (of) origin to Shreveport, except Breckenridge, from which point the special rate was 28½ cents. Under the special rates, casing-head gasoline might be hauled from Breckenridge to Wichita Falls, a distance of 103 miles, at 15 cents per 100 pounds; while the rate from Burkburnett to Gainesville, a distance of 103 miles, was 39½ cents. From Breckenridge to Gainesville or Harrys, a distance of 177.9 miles and 122.9 miles, respectively, the charge was 39½ cents per 100 pounds. Likewise from Burkburnett to Wichita Falls, a distance of 14 miles, the special rate was 11 cents; while from Burkburnett to Gainesville, 103 miles, and to Harrys, 154.6 miles, the rate was 39½ cents. From Burkburnett to Shreveport, La., 345 miles, the rate was 25 cents per 100 pounds, as against the maximum of 39½ cents to Gainesville and Harrys, respectively. Thus it may be observed that casing-head gasoline, originating at Burkburnett, Electra, or Iowa Park, could move, and doubtless did move, through Gainesville, 103 miles from Burkburnett, to Shreveport, La., 345 miles; Gainesville paying 39½ cents, while Shreveport received a special rate of 25 cents. From Burkburnett to Harrys, 154.6 miles, the maximum rate of 39½ cents against the special rate of 25 cents to Shreveport. Substantially the same comparisons apply to casing-head gasoline originating at Electra, Breckenridge, and Iowa Park. The plaintiffs introduced considerable evidence to show their disadvantage by reason of the lower rates accorded their competitors at Wichita Falls and Shreveport and the damage resulting from the alleged discrimination.

"It is undoubtedly a recognized principle of rate-making that a mere difference in rates does not always constitute an unjust discrimination, and there are numerous instances in which the carriers are allowed, without being guilty of discrimination, to make special rates to meet special conditions, competitive or otherwise. This principle is involved in and recognized in the long and short hauls; it often becoming necessary, to enable the carrier to preserve its revenue, to authorize a lower rate for a longer distance than to points intermediate. But these exceptions must be based upon sound reasoning therefor, if they are to be free from discriminatory charges.

"Casing-head gasoline, as such, cannot be moved for any material distance in pipe lines; therefore there was no pipe-line competition to justify or authorize the reduction shown from points of origin to Wichita Falls, nor is there in the record shown any justification by competitive conditions, either pipe line or otherwise, for the difference in the rates from the points of origin in question to Shreveport, La., and to Gainesville and Harrys, Tex., where the refineries of plaintiffs are located. The special rates were made voluntarily by the railroads; that is to say, the rates from the different points in Texas to Wichita Falls were made upon application to the Railroad Commission by the carriers and the rates authorized. Neither their reasonableness nor their justness in all respects, and with respect to all possible situations that might arise, was decided by this commission, but, as authorized, their status was more or less the same as that of interstate rates filed to take effect after a given length of time. It is manifestly impossible for the Railroad Commission to make a complete investigation of all rate changes proposed by the carriers themselves without a hearing and the introduction of evidence to support a proposed change in tariff, and it is not a violent presumption that the carriers assume the responsibility, when they make application to this commission for a change in rate, of establishing a rate which will be just, reasonable, and nondiscriminatory. While the Railroad Commission of Texas certainly has no jurisdiction over the rates charged from Texas points of origin to Shreveport, La., it is, we believe, within the lawful province of the said commission to prevent discrimination against intrastate commerce by special rates granted in interstate commerce, and, when this situation was presented to the Railroad Commission of Texas by application of plaintiffs in this proceeding and others, and after hearing, this commission recognized the unjustness of the 39½ cent rate to Texas common points as compared to the 25 cent rate to Shreveport, and the special rates to Wichita Falls, and entered its order, effective March 10, 1923, reducing the rate on casing-head gasoline between points in Texas, fixing a maximum rate of 25 cents per 100 pounds in common point territory.

"Without entering into a discussion of the reasons therefor, we are of the opinion that the contention of the plaintiffs that the rates provided in the tariff on intrastate traffic in Texas were not lawfully authorized by this commission is not sound. Plaintiffs also contend that the proceedings of the Railroad Commission of Texas incident to the vacation of the Shreveport order; that is to say, the adoption by this commission of tariffs existing at the time, were not lawful, because not set for a public hearing and notice given. This is not, in our judgment, sound. The statutes require that notice be given only to the carriers, and they alone in our judgment would have a right to complain of the failure to issue and hold a hearing. We do not agree with plaintiffs in their view that the common law regarding freight rates is effective. We believe the sounder and greater preponderance of authority is to the effect that the statute creating the Railroad Commission of Texas and giving it jurisdiction over freight rates in this state supersedes and takes the place of the common law.

"From what we have said, it follows that it is the opinion of the commission that the defendants have violated the law prohibiting unjust discrimination to the extent that the rates charged exceeded the maximum rate of 25 cents per 100 pounds, and that the plaintiffs have suffered damage in that amount. We further find that such violation of the law was not willful, and the claim for exemplary damage is denied. We find the plaintiff Clayton Oil & Refining Company has been damaged in the sum of $15,137.73; and the plaintiff Producers' Refining Company has been damaged in the sum of $25,005.48, and the defendants herein are called upon and directed, in proportion to their participation in the division of the freight charges assessed, to satisfy, on or before March 15, 1925, the damages here found to have been done the complainants. An appropriate order in accordance with this opinion will be issued."

It will thus be seen that the reparations awarded were for discrimination in rates previously fixed by the commission.

The railroad companies attack the order as unjust, unreasonable, and void upon the following grounds:

(1) The rates charged by the railroad companies having been fixed by the commission, and not having been attacked as provided by law, were binding both on the carriers and shippers, and their collection was not, and could not be, a violation of some law of the state or provision of the Commission Act for which a penalty is provided, which violation was by article 6664 an express prerequisite to any proceeding and finding of damages thereunder.

(2) The rates charged were in force on February 29, 1920, and therefore the commission order was in violation of the federal Transportation Act of 1920 (41 Stat. 456).

(3) The commission order was violative of article 6676, Revised Statutes of 1911, and of subdivision 3, § 8, of article 1, of the Federal Constitution, in that the discrimination found by the commission was based upon interstate rates from Texas points to Shreveport, La.; and it was beyond the power of the commission under both the stated statute and constitutional provision, to make rate adjustments based in whole or in part upon interstate rates or transportation.

(4) The effect of the order was retroactively to operate upon rates made by the commission, and it was therefore violative of section 16 of article 1 of the Texas Constitu-

tion prohibiting any retroactive law; and for the same reason the order was violative of the due process of law provision of the Fourteenth Amendment to the Federal Constitution.

(5) If article 6664 in fact attempts to confer upon the commission the authority exercised in the order it violates article 2 of the Texas Constitution dividing the government into executive, judicial, and legislative departments, in that it confers judicial power upon the commission, which is a legislative and administrative agency of the government.

, (6) Article 6664, if attempting to confer the power sought to be exercised by the commission, is further violative of the equal protection of the law provision of the Fourteenth Amendment to the Federal Constitution, in that it authorizes shippers to recover from carriers charges under rates theretofore established by the commission, without giving a corresponding right to the carriers to recover from the shippers under like circumstances.

(7) The proceeding before the commission and order thereunder are void because the complaints were not brought in the name of the state upon the relation of the complainants as provided by article 6664.

[1] In view of the conclusion we have reached that the first ground of attack above is well taken, we will pretermit discussion of the other grounds, except in so far as they may be incident to the first. The proceeding before the commission, it will be noted, was brought under article 6664, Revised Statutes of 1911; and, unless authorized by that article, the order of the commission must fall. We therefore quote the article in full:

"Any person, firm, corporation, or association, or any mercantile, agricultural, or manufacturing association, or any body politic, or municipal organization, complaining of anything done or omitted to be done by any railroad subject hereto, in violation of any law of this state, or the provisions of this chapter, for which penalty is provided, may apply to said commission in such manner and under such rules as the commission may prescribe; whereupon, if there shall appear to the commission to be any reasonable grounds for investigating such complaint, it shall give at least five days' notice to such railroad of such charge and complaint, and call upon said road to answer the same at a time and place to be specified by the commission. The commission shall investigate and determine such complaint under such rules and modes of procedure as it may adopt. If the commission finds that there has been a violation, it shall determine if the same was willful; if it finds that such violation was not willful, it may call upon said road to satisfy the damage done to the complainant thereby, stating the amount of such damage, and to pay the cost of such investigation; and if the said railroad shall do so within the time specified by the commission there shall be no prosecution by the state; but if said railroad shall not pay said damage

and cost within the time specified by said commission, or if the commission finds such violation to be willful, it shall institute proceedings to recover the penalty for such violation and the cost of such investigation. All such complaints shall be made in the name of the state of Texas upon the relation of such complainant. All evidence taken before said commission in the investigation of any such complaint, when reduced to writing and signed and sworn to by the witness, may be used by either party, the state, complainant, or the railroad company, in any proceeding against such railroad involving the same subject-matter; provided, further, that the commissioners may require the testimony so taken before them to be reduced to writing when they may deem it necessary, or when requested to do so by either party to such proceedings; and a certified copy, under the hand and seal of said commission, shall be admissible in evidence upon the trial of any cause or proceeding growing out of the same transaction against such railroad, involving the same subject-matter and between the same parties. The provisions of this article shall not abridge nor affect the rights of any person to sue for any penalty that may be due him under the provisions of this chapter, or any other law of this state."

Associate Justice Brown, speaking for the Supreme Court in Moore v. Bell, 95 Tex. 151, 66 S. W. 45, analyzes the article as follows:

"By the foregoing articles, the Railroad Commission was empowered to investigate all charges which might be made against railroad companies for the violation of any of the provisions of that law and was empowered (1) to determine whether there had been a violation or not; (2) whether the violation was willful or not; (3) if not willful, to prescribe terms upon which the railroad company could settle with the injured party, which, if complied with, would prevent suit for the recovery of the penalty; (4) if the terms should not be complied with or if the violation was willful, it would be the duty of the Railroad Commission to institute proceedings to recover the penalties, by reporting the facts 'to the Attorney General or other officer charged with the enforcement of the law' and requesting him to institute proceedings thereon.

"The powers conferred are largely discretionary; they embrace every phase of the proceedings preliminary to the filing of a suit to enforce obedience to the law, and there is no law by which any officer or department of the government may institute a suit for those purposes, except upon the recommendation of the Railroad Commission."

[2] This analysis clearly sets forth that the sole purpose of the article is to determine whether there has been "anything done or omitted to be done by any railroad subject hereto, in violation of any law of this state, or the provisions of this chapter, for which penalty is provided." Unless, therefore, the railroad companies have done or omitted something, the doing or omission of which would be in violation of a law prescribing a penalty, the Railroad Commission was

without power to act under the article. When no such violation appears, the power of the commission terminates. Where a violation is found, it then becomes the duty of the commission to determine whether it was willful. If not, the commission is authorized to ascertain the amount of damages occasioned by the violation and to call upon the offending company to satisfy the damage and the cost of investigation. If the offending company complies with the order, there is no prosecution by the state for penalty. On the other hand, if the violation is found to be willful, or, where not willful, if the offending company fails to satisfy the complaint, the commission is charged with the duty of causing the institution of proceedings to recover the penalty attaching to the unlawful act and the cost of investigation.

Our first inquiry, therefore, is directed to the question whether there has been a violation of some law for which a penalty is provided.

The Railroad Commission based its holding that there had been such violation upon Revised Statutes of 1911, art. 6670, defining unjust discrimination, and providing penalty therefor. The particular provisions of that article upon which the commission and the oil companies rely as justification for the order follow:

"If any railroad subject hereto, directly or indirectly, or by any special rate, rebate, drawback or other device, shall charge, demand, collect or receive from any person, firm or corporation a greater or less compensation for any service rendered or to be rendered by it, than it charges, demands, collects or receives from any other person, firm or corporation for doing a like and contemporaneous service, such railroad shall be deemed guilty of unjust discrimination, which is hereby prohibited.

"It shall also be an unjust discrimination for any such railroad to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or to subject any particular description of traffic to any undue or unreasonable prejudice, delay or disadvantage in any respect whatsoever."

The first paragraph of the article quoted deals with special rates, rebates, drawbacks, or other devices whereby one shipper is given a preference in rates or charges over other shippers for the same or a like service. It is manifest that the collection of a rate fixed by the commission which is applicable to all shippers of the same commodity under the same conditions between the same points of shipment could not be classed as a special rate, a rebate, drawback, or other device whereby one shipper was given a preference in rates over another shipper.

The second paragraph does not expressly mention rates or charges. It deals with preferences or advantages generally which may be given to any individual or locality, or to any particular character of traffic. There are a variety of matters in which preferences between individuals and localities and undue advantages to particular commodities might be given even where the rates were just, reasonable, and nondiscriminatory. We may concede, however, that the language of this paragraph is broad enough to include discriminations to individuals, localities, and commodities in the matter of rates. Conceding this construction, the question then presents itself whether such discrimination is a violation of law by the carrier for which it would be subject to a penalty where the rate charged and collected is fixed not by the carrier but by the Railroad Commission itself. In other words, was it the intention of the Legislature in the paragraph quoted, and, if so, did the Legislature have the power to penalize a carrier for exacting a rate made by a governmental instrumentality to which the rate-making power was lawfully delegated, when by other statutes the carrier was required to charge the rate so fixed, no more and no less, under penalties, and such rates were made conclusive as to their reasonableness, fairness, and justness as between the shipper and carrier until found otherwise in a direct action brought for that purpose under named articles of the statutes?

We think this question in both of its branches should be answered in the negative. The Railroad Commission Act takes away from the carriers the rate-making power, and vests it in the Railroad Commission. Article 6654, Revised Statutes 1911. This is not only the clear import of Article 6654, but such has been the express holding of the Supreme Court whenever the question has arisen.

As tersely expressed by Associate Justice Brown in Railroad Commission v. Weld & Neville, 96 Tex. 405, 73 S. W. 532:

"The Railroad Commission Law deprived railroad companies of the power to make rates and conferred that authority upon the commission, which necessarily took from shippers any right of redress against carriers in case the rates were unreasonable, because they are compelled by law to carry at the rate fixed by the commission, and cannot be held responsible for excess in charges thus forced upon them."

Expressly by subdivision 2 of that article the commission is not only given power, but it is made its duty to fix "a reasonable rate" on all classes of commodities. In some respects rules are prescribed for determining the reasonableness of rates, but, generally speaking, the commission is vested with a large discretion in that matter. Article 6657 provides for a review by the courts of any rate, classification, rule, charge, order, act, or regulation adopted by the commission which may be instituted either by the carrier or any other interested party. Under article 6658, this power of review is extended to a

determination of the unreasonableness and unjustness to the complaining party of the particular rate, etc., attacked. Until found unreasonable, unfair, or unjust under these two articles, such rates, etc., are by article 6656 uncontrovertible as between private parties and carriers. It is not contended that the rates complained of have ever been brought in question by direct proceeding under articles 6657 and 6658, as was the case in Railroad Commission v. Galveston Chamber of Commerce, 51 Tex. Civ. App. 476, 115 S. W. 94 (writ of error denied); nor is it contended that the railroad company could lawfully have charged and collected any rate for the shipments involved than those which it did charge and collect which were established rates of the Railroad Commission applicable to the commodities shipped between the points of shipment. We are unable to construct a reasonable theory under which the railroad companies could be held to have violated a law prescribing a penalty by doing that which the law required them to do, and which, if they had not done,. would subject them to a penalty. It is not controverted, nor could it be controverted, that this is the exact status of the parties at the time the proceeding before the commission was instituted. It would therefore seem inevitably to follow that at that time there was no act done or omitted by any of the carriers to this proceeding which would have sustained an action for penalty whether intentionally or unintentionally done.

[3, 4] There was not therefore, at the time the proceeding was brought, any act or omission of the carriers for investigation under article 6664. That article provided for the investigation of violations of law for which a penalty was provided. Necessarily, in making a complaint under the article, the complainant must point out some specific thing done or omitted which constituted such violation before the complaint could have any standing before the commission. The complaints here involved on their face showed that there had been no violation of law for which a penalty was provided, because, if a suit for penalty had been brought at that time instead of the complaints, the action must necessarily fall, because the very thing complained of was a thing conclusively presumed to be lawful, and a thing which, if not done, would have subjected the carriers to a statutory penalty. This proposition seems clear and unanswerable, and to our mind disposes of the case. What, in fact, the oil companies were attempting to have done was not the investigation of a claim for the violation of a statute imposing a penalty, but a review by the Railroad Commission of rates which it had already made and a determination by the commission (1) that they were discriminatory; and (2) of the amount of damage to complainants, oc-

casioned by such discrimination. If, for the moment, it were conceded that the commission had this power, it can hardly be contended that such power is given it under article 6664, for that article presupposes an existing violation of some law prescribing a penalty, and that is the only subject which the commission is by that article invested with power and duty to investigate.

We are not impressed with the soundness of the reasoning under which it is urged that the commission has this power either independently of or under article 6664. We find nothing in the statutes which either expressly or by necessary or proper implication confers this power.

The commission is invested with ample and plenary powers generally touching the matter of correcting abuses that arise out of transportation by common carriers. Some of those powers and duties are legislative or quasi legislative in character, while others are judicial or quasi judicial. It may be conceded for the purposes of this case that the constitutional provision under which the Railroad Commission was authorized is amply broad to warrant the conferring upon it of all powers necessary to carry out the purposes of the Constitution, regardless of the particular department of the government— that is legislative, judicial, or executive— under which they might be properly classified. The question here is not the power of the Legislature to confer an authority, but what authority the Legislature in fact conferred.

[5, 6] Rate making is essentially a legislative function, and operates prospectively. Railroad Commission v. Weld & Neville, above; Prentis v. Atlantic Coast Line Co., 211 U. S. 226, 29 S. Ct. 67, 53 L. Ed. 158, 159, and authorities there cited. And the same is true of many rules and regulations within the delegated powers of the commission. Rate making has been delegated to the Railroad Commission alone, and its acts in that regard have the force and effect of statutes, and are subject to review to the extent only that statutes of the same import are so subject, with the additional power which articles 6657 and 6658 confer upon the courts to determine whether a rate, etc., is unreasonable or unjust to the party complaining.

[7] On the other hand, the unjustness or unreasonableness or discriminatory effect of an existing rate which is attacked not under these statutes or otherwise in a direct proceeding to annul it or compel its modification, but for the purpose of reimbursement for unjust, unreasonable, or discriminatory charges theretofore paid under it, constitutes a judicial inquiry. And, while ample express powers are conferred upon the commission as a legislative rate-making body, we find nothing in the act which confers upon it the judicial or quasi judicial power to re-

open a rate it has fixed, and determine its unreasonableness, unjustness, or discriminatory effect in ·so far as it has operated upon transactions that have already taken place. All of the statutory provisions in regard to rate-making powers and duties of the commission appear to be legislative in character and prospective in operation.

The contention of the oil companies which was sustained by the commission and the trial court to the effect that this power, judicial in its nature, of awarding reparations for unjustness, unreasonableness, and discriminatory effect of pre-existing rates, is predicated in the main upon the holdings of the federal courts to the effect that a like power is conferred upon the Interstate Commerce Commission ·by federal statute (section 13 of title 49, Transportation Act [49 USCA § 13; U. S. Comp. St. § 8581]), of like import as our article 6664.

It is contended that, as our statutes were taken largely from the provisions of the Transportation Act, they should be given the same construction given that act by the federal courts. There is, however, this fundamental difference between the rate-making power of the Texas Railroad Commission and the rate-making power of the Interstate Commerce Commission under the Transportation Act. In the state act, as pointed out above, the rate-making power is taken away from the carriers altogether, and vested exclusively in the commission, whereas, under the Transportation ‚Act, the rates are made by the carriers themselves, and the duty is expressly imposed upon them to fix just, reasonable, and nondiscriminatory rates. It is true that, when rates are thus fixed and filed with the commission, they become operative after 30 days, and have the same force and effect as rates fixed by the Texas commission until set aside. In like manner they are immune from collateral attack, and the carriers are not authorized to charge any shipper a greater or less rate than fixed by the tariffs. But still they are not approved by, and are not the rates of, the Commerce Commission, but the rates of the railroads themselves, and their .justness, reasonableness, and discriminatory effect, both prospectively and retroactively, are the subject of proper inquiry in the proper forum; and that forum has repeatedly been held to be the Interstate Commerce Commission itself. Texas & P. R. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 S. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075; Interstate Commerce Commission v. Louisville & N. R. Co., 227 U. S. 88, 33 S. Ct. 185, 57 L. Ed. 431; Pennsylvania R. Co. v. Coal Co., 230 U. S. 184, 33 S. Ct. 893, 57 L. Ed. 1447, Ann. Cas. 1915A, 315; Baer Bros. v. Denver & R. G. R. Co., 233 U. S. 479, 34 S. Ct. 641, 58. L. Ed. 1055; Houston, East & West Texas R. Co. v. United States, 234 U. S. 342, 34 S. Ct.

833, 58 L. Ed. 1341. When not so attacked they are conclusive.

There are three controlling differences between our article 6664 and the corresponding provisions of the Transportation Act. Section 13 of the latter authorizes any person, etc., to make complaint to the Commerce Commission for anything done or omitted by a carrier subject to provisions of the act "in contravention of the provisions thereof." It is to be noted that the thing for which complaint is authorized is an act or omission in contravention of the provisions of the Transportation Act; whereas the complaint under article 6664 is of any act or omission in violation of a law for which a penalty is provided. Under the Transportation Act the carrier is expressly charged with the duty of fixing just, reasonable, and nondiscriminatory rates, a failure in which regard would necessarily be a violation of a provision of the act.

Another marked distinction between the federal and state statutes is that the former authorize the proceeding to be brought directly by the person, etc., aggrieved; whereas the latter requires that it be brought in the name of the state upon the relation of the aggrieved party; thus clearly indicating the purpose, of the state statute to be merely a preliminary proceeding as a basis for a penalty suit.

The third essential difference between the state and federal statutes is that, under the former,. the party aggrieved is expressly authorized to maintain an action to recover the amount of reparation awarded; whereas no such right is given in article 6664.

These differences, we think, clearly are based upon the fundamental difference in the powers of the two bodies with reference to the matter of rate making. Under the Transportation Act, the rates are made by the carriers, and are subject to review by the Commerce Commission; whereas, under the State Railroad Commission Act, this power' is taken away from the carriers altogether, and vested in the Railroad Commission, with the right of review within the statutory grounds by the courts. With this distinction clearly in mind, the differences in the Texas statutes and the Transportation Act above pointed out become apparent. The purpose of section 13 of the Transportation Act is clearly to afford a remedy to parties aggrieved by any violation of the act, and this remedy is made complete through the prescribed‘. procedure.

Article 6664 has no such purpose. Some of its language, it is true, is identical with that of section 13 of the Transportation Act, but the differences pointed out are marked and essential. It has nothing to do, except in an incidental way, with adjusting claims of shippers. Its only purpose is to determine whether there has been a violation of

law for which a penalty is provided, and, if so, whether that violation was lawful. The only particular in which private rights are permitted to be adjusted is in the provision that, where the violation is found not to be willful, the carrier is permitted to relieve itself of penalty prescribed by law by satisfying the claim of the injured party, the amount of which for that purpose the Railroad Commission is given authority to ascertain. There is nothing in this article that confers the general power on the Railroad Commission to adjudicate the rights of shipper and carrier generally, and no basis whatever that we can find for awarding reparations based upon unjustness, unreasonableness, or discrimination in pre-existing rates fixed by the commission.

While the question here presented is one of first impression in this state, we believe the conclusions thus reached are in accord with the principles announced in the decisions above cited and numerous others of similar import which we have examined.

We are sustained also in our views by decisions of the Supreme Courts of Louisiana, Mississippi, and Alabama, Texas & P. R. Co. v. R. R. Com. of Louisiana, 137 La. 1059, 69 So. 837; Young Heading Co. v. Payne, 127 Miss. 48, 89 So. 782; Miller Mill Co. v. Louisville & N. R. Co., 207 Ala. 253, 92 So. 797.

In each of these cases the distinction between the rate-making power of the federal and state commissions in the particular above noted is pointed out. In the Alabama case the question was substantially the same as that at bar, and the contentions urged appear to be the same as those presented here. We quote the following from the court's opinion on rehearing:

"In reply we wish merely to call the learned counsel's attention to the fact that the federal cases have been decided under a regulatory system quite different from our own, and are therefore wholly inapt. Indeed, it should be unnecessary for us to point out that, under the federal system, the carrier files and publishes its tariffs sua sponte, and they go into operation without any judgment or order of approval by the Interstate Commerce Commission, and are subject to review and condemnation as unreasonable, in which event the law itself provides for restitution to complaining shippers of all charges collected in excess of the rate thereafter found by the commission to be the reasonable rate, and established by it as such. When the carrier files its rates it is fully understood that they are provisional only, and subject to disallowance, with retroactive effect. In this respect, as will be seen from our previous discussion, the Alabama system is radically different; and counsel's failure to perceive the difference seems to be the source of all of the fallacious reasoning upon which the criticism of our opinion has been grounded."

Some of the holdings of the commission in its opinion require, we think, special notice. We read from the opinion:

"It appears to us that under the Texas statute there is as sound reason for allowing the Railroad Commission of Texas to test a rate for unjust discrimination and other unlawful features after it has been authorized by this commission as it is to allow the Interstate Commerce Commission to do the same thing for an interstate rate after it has become the lawful rate. There is such similarity between the two provisions of the law that, if this authority is carried in one, it certainly must in a like degree be lodged in the other. It occurs to us also that sound public policy would make necessary such a construction of this act as would confer this authority upon the Railroad Commission of Texas, otherwise it is doubtful if there would be a forum in which a shipper might seek redress for an erroneous rate promulgated by this commission or authorized upon application of the carriers, if it should later appear that discrimination had been brought about by such rate. It would be a desirable thing to feel that the commission could make no errors in judgment, but it doubtless does often occur that, when rates are promulgated, all the facts do not appear at the time or that subsequent to the promulgation of a rate conditions change to such an extent that the rate is burdensome and unfair, and before the necessary steps may be taken to correct it substantial injury may be done those who must pay as the tariffs provide."

The answer to this view lies, we believe, in the fact that the Legislature has, by articles 6657 and 6658, prescribed a method of correction by resort to the courts, and that method, so far as the legislative intent has been expressed, is conclusive. We quote, in this connection, from Railroad Commission v. Weld & Neville, above:

"The commission was organized as arbiter between carriers and shippers and for that purpose is invested with very large but not absolute powers. To secure the rights of both carrier and shipper against errors or intentional wrongs which might be committed by the Railroad Commission, articles 4564–4566 [Rev. St. 1895] were adopted, which give the railroads a right of action against the commission to set aside such rates as might be prescribed for their government in case they should be unremunerative, giving to the shippers an action against the commission to secure a reduction of such rates in case they be unreasonably high."

[8] The holding of the commission that the Wichita Falls rates, though approved by it, were in fact made by the carriers, because made upon their application, is unsound. Rates, to be effective under the Texas act, must be made by the commission itself, and are inoperative other than by force of the commission orders. It is immaterial where the initiative lies, whether with the commission itself, or with the carriers, the shippers, commercial organizations, communities, or other interested parties. In either instance the duties and powers of the commission and the effect of its orders are the same. It may be noted in this connection that, under the Alabama act, the proposed

rates are filed by the carriers, but must be approved by the commission.

[9] Nor do we think there is merit in the holding that the Shreveport rates could be questioned as 'discriminatory, because fixed by tariffs filed with the Interstate Commerce Commission by the carriers, and therefore held to be the rates of the carriers and not of the federal commission. They were, nevertheless binding upon everyone until successfully attacked in the proper forum; which forum, as we have seen, was the Interstate Commission alone. Houston, East & West Texas R. Co. v. United States, 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341.

The trial court's judgment sustaining the general demurrer to the railroad companies' petition and dismissing the case is reversed, and the cause (other than upon the cross-action) is remanded to that court for further proceedings in accordance with this opinion.

Reversed and remanded.