COTTING v. KANSAS CITY STOCK-YARDS CO. et al.

HIGGINSON v. SAME.

(Circuit Court, D. Kansas, First Division. October 28, 1897.)

Nos. 7,427 and 7,453.

1. COMMERCE—LEGISLATIVE REGULATIONS—STOCK YARDS.
   A stock-yard business, located in a large city, at the junction of many railroad lines, which furnishes the only proper facilities for the unloading, resting, and feeding of live stock in transit, and for the sale of cattle within said city, is affected with a public use, so as to be subject to legislative control, and the proper legislative body may prescribe a maximum rate of compensation for the care and handling of stock thereat.

2. INTERSTATE COMMERCE—STOCK-YARDS BUSINESS.
   It is doubtful whether the business of a stock-yards company, which itself neither buys nor sells live stock, but merely renders services to the owners thereof, in yarding, feeding, watering, and weighing the animals, constitutes interstate commerce, though a large proportion of the animals come to its yards from other states, and are therefore themselves subjects of interstate commerce. The fact that a particular stock yard extends over the boundary line between two states does not make the business there carried on interstate commerce.

3. SAME—REGULATION BY STATE.
   Conceding that the business of a stock-yards company in handling live stock in transit from other states is so intimately related to interstate commerce which is transacted in its yards by other persons that congress might lawfully prescribe maximum charges for yarding, feeding, and caring for stock coming from other states, yet this power is not of such an exclusive character as to prevent the state from prescribing such rates, in the absence of any legislation on the subject by congress.

4. CONSTITUTIONAL LAW—DUE PROCESS AND EQUAL PROTECTION—CONFISCATION—FIXING COMPENSATION FOR SERVICES RENDERED.
   In determining whether a state statute prescribing rates of charges by a stock-yards company is reasonable, or confiscatory, so as to amount to a taking without due process of law, or the denial of the equal protection of the laws, a prime factor is the valuation which shall be placed on the

property of the stock-yards company used in its business of yarding and feeding stock.

5. SAME.

When a valuation is placed on property, which has become affected with a public use, for the purpose of ascertaining whether the maximum rate of compensation fixed by law for its use is reasonable or otherwise, the income derived therefrom by the owner before it was subjected to legislative control cannot always be accepted as a proper test of value, because the charges then made may have been excessive and unreasonable. And, when the property has been capitalized by issuing stock, neither the market value nor the par value of the stock can be accepted in all cases as a proper criterion of value, because the stock may not represent the money actually invested, and because the property may have been capitalized mainly with reference to its income-producing capacity, on the assumption that it was ordinary private property, which the owner may use as he pleases, without being subject to legislative control. On the other hand, the owner is entitled to the benefit of any appreciation in value above original cost resulting from natural causes, such as improvements made in the vicinity, growth of the town, etc.

6. SAME.

A state statute prescribing maximum charges to be made by a stock-yards company, and which allows an income of 5.3 per cent. annually on the actual value of the property used for stock-yards purposes, or of 4.6 per cent. on the capitalized value of the property and business, is not confiscatory, though it reduces the previous net income nearly 50 per cent.

7. TEMPORARY INJUNCTION—DISMISSAL OF BILL.

In a suit to enjoin the enforcement of a state statute prescribing maximum charges of a given business, on the ground that it amounts to an unconstitutional confiscation of property, where the questions involved are doubtful, the court, though it decides to dismiss the bill, will grant a temporary injunction pending a probable appeal; it appearing that the enforcement of the statute meantime would produce great harm to the complainant's business.

J. M. Woolworth, A. H. Horton, and D. R. Hite, for complainants.
L. C. Boyle and David Martin, for the attorney general.

Before THAYER, Circuit Judge, and FOSTER, District Judge.

THAYER, Circuit Judge. These cases have been before this court on two previous occasions—First, on an application for a preliminary injunction; and, second, on a motion to continue the injunction. 79 Fed. 679; 82 Fed. 839. The nature of the litigation, and the questions involved therein, have therefore become well known, and are familiar to the bar. For these reasons it does not seem necessary on the present occasion to do more than announce in a succinct form the conclusions which have been reached on the points in controversy.

1. The property of the Kansas City Stock-Yards Company located in Kansas City, Kan., and Kansas City, Mo., which is used for yarding, feeding, watering, and weighing cattle, has, by the voluntary act of the corporation which owns the same, become affected with a public use, and is therefore subject to legislative control, state or national, to the extent, at least, that the proper legislative body may prescribe a maximum rate of compensation to be charged for the services rendered at said yards in caring for live stock. The public have a greater interest in said property, and in the management thereof, than in other private property, because it is located in a large city, at the junction point of many lines of railroad, which radiate there-

from in all directions; because of the vast number of cattle and other live stock which annually seek a market in the cities where the property is located, or pass through said cities on their way to other markets; and because of the manner in which, according to business usage, the traffic in cattle is carried on. The stock yards in question furnish the only proper facilities in the cities where they are located for unloading, resting, and feeding stock which is in course of transit to other markets. It is the place where buyers and sellers of live stock congregate and transact their daily business, and for that reason it is the only available market place in said cities where live stock can be conveniently sold and delivered. The stock-yards company, by its foresight and energy, has doubtless done much to create these conditions; but the fact remains that nearly all cattle shippers and dealers residing in states and territories tributary to the Kansas City market are compelled to avail themselves of the facilities which the stock-yards company affords, and to pay such charges as it may see fit to impose. Therefore it is that the proper legislative body has the power to fix a limit to such charges, to the end that they may not become excessive and unreasonable. To such regulations every person and corporation must submit, when their property is of such character, or is so situated and subject to such environments, that many people are compelled to become their patrons. Munn v. Illinois, 94 U. S. 113, 130.

2. While much business is transacted at the Kansas City stock yards, consisting in the purchase and sale of live stock shipped to that market from other states than Kansas, which is interstate business, yet it is doubtful whether the stock-yards company itself is engaged in interstate commerce. It neither buys nor sells cattle or other animals. Its business consists in yarding, feeding, watering, and weighing live stock for its customers. It also loads and unloads stock from cars, but in this latter respect it acts merely as employé of the various railroad companies, from whom alone it receives compensation for such services. The claim of the stock-yards company that it is engaged in interstate commerce derives no additional support from the accidental location of its yards on the boundary line between two states. The inherent character of the business which it transacts, as above described, is not changed by the fact that its yards are located partly in Kansas and partly in Missouri, and that it herds cattle on both sides of the line, and drives them, while in its custody, to and fro across the line, to suit its own convenience, or the convenience of its customers. This shifting of live stock from one side of the state line to the other, within its own yards, and for its own convenience, is not interstate commerce, within the proper meaning of that phrase. Conceding, however, but without deciding, that the business in which the stock-yards company is engaged is so intimately related to interstate business transacted in its yards by other persons that congress might lawfully prescribe a maximum rate of charges for yarding and feeding cattle shipped thereto from other states than Kansas, still the court is of the opinion that this power to fix a limit to such charges is not of such an exclusive character as to prevent the state of Kansas from exercising a similar power, in

the absence of any legislation on the subject by congress. It is not necessary, or even expedient, that such charges should be uniform in the various stock yards throughout the country, because stock can be yarded and fed more cheaply in some localities than in others. Diverse regulations on this particular subject by the different states will create no conflict of authority, and lead to no embarrassments. The subject, therefore, with which the Kansas statute undertakes to deal, is not national in its character, as was the case with the statutes involved in Wabash, St. L. & P. Ry. Co. v. Illinois, 118 U. S. 557, 7 Sup. Ct. 4, and in Covington & C. Bridge Co. v. Kentucky, 154 U. S. 204, 14 Sup. Ct. 1087; but it is a matter susceptible of local regulation and control, without trenching on the exclusive authority of congress. The statute in question does not impose a tax on interstate commerce, nor exact a license fee from those engaged in such business, nor prescribe conditions subject to which such business shall be carried on, nor interpose obstacles to the free flow of such traffic. Its effect on interstate traffic is purely incidental, and, to the extent that it prevents excessive charges for yarding and feeding cattle in course of transit, it tends to facilitate, rather than to hinder, such traffic. In short, it may be said with reference to the claim that the Kansas statute is void, because it is a regulation of interstate commerce, that such contention in behalf of the complainants must be overruled, on the strength of Munn v. Illinois, already cited, and several other cases, notably Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468, and Brass v. North Dakota, 153 U. S. 391, 14 Sup. Ct. 857, wherein state statutes limiting the rate to be charged for elevating grain into elevators, and storing and delivering the same, were upheld, as not being in violation of the commerce clause of the federal constitution. The case at bar differs from those last cited, in that the state of Kansas is here attempting to control the conduct of a corporation of its own creation; but, without laying any stress on the latter fact, it is sufficient to say that the cases last referred to and the one at bar are in all essential respects parallel, and that the distinction between them which counsel attempt to draw is more fanciful than real.

3. The important question presented by these cases, and the only question which is not foreclosed by controlling authority, is whether the maximum rates prescribed by the Kansas statute for yarding and feeding live stock are reasonable, or in their nature confiscatory. If confiscatory, the act, or so much thereof as prescribes rates, is void, by the provisions of the fourteenth amendment of the federal constitution, which prohibits a state from taking property "without due process of law," or denying "to any person within its jurisdiction the equal protection of the laws." Railroad Commission Cases, 116 U. S. 307, 331, 6 Sup. Ct. 334, 348, 349, 388, 391, 1191; Reagan v. Trust Co., 154 U. S. 362, 399, 14 Sup. Ct. 1047. A prime factor in determining whether the prescribed rates are reasonable or confiscatory is the valuation which shall be placed on the property of the stock-yards company, which is used for the purpose of yarding and feeding stock. With reference to that subject, it may be said that different methods of estimating the value of property may properly be

employed when it is valued for different purposes. When a valuation is placed on property which has become affected with a public use, for the purpose of ascertaining whether the maximum rate of compensation fixed by law for its use is reasonable or otherwise, it is obvious that the income derived therefrom by the owner before it was subjected to legislative control cannot always be accepted as a proper test of value, because the compensation which the owner charged for its use may have been excessive and unreasonable. Again, when property has been capitalized by issuing stock, neither the market value nor the par value of the stock can be accepted in all cases as a proper criterion of value, because the stock may not represent the money actually invested, and, furthermore, because the property may have been capitalized mainly with reference to its income-producing capacity, on the assumption that it is ordinary private property, which the owner may use as he thinks proper, without being subject to legislative control. On the other hand, however, when property is valued for the purpose last stated, it is clear that the owner thereof is entitled to the benefit of any appreciation in value above the original cost and the cost of improvements, which is due to what may be termed natural causes. If improvements made in the vicinity of the property, the growth of the city or town where it is located, the building of railroads, the development of the surrounding country, and other like causes, give property an increased value, the owner cannot be deprived of such increase by legislative action which prevents him from realizing an income commensurate with the enhanced value of his property. Applying these general principles to the case in hand, the court concludes that neither the sum for which the property of the stock-yards company has been capitalized, to wit, $7,368,650, nor the market value of its stock, can be accepted in this proceeding as a correct test of its value. In the first place, the outstanding stock represents property of the value of upwards of $1,000,000, not used for the purpose of yarding and feeding stock, which must be excluded in computing the value of the company's property which will be affected by the statute in question. In the second place, a large percentage of the stock now outstanding does not represent money actually paid in by the shareholders, or property conveyed to the corporation, but represents, rather, an assumed appreciation in the value of the company's property over first cost, and the good will of its business. On one occasion the stock of the company was doubled (that is to say, it was increased from $1,-000,000 to $2,000,000), without the payment of any money; each stockholder receiving an additional amount of stock equal to the amount which he then held. It is fair to infer that a large amount of stock has been issued by the company, not so much with reference to the actual value of its physical property, as with reference to the income which it could be made to produce, and the dividends it could be made to pay. That this latter consideration has been a potent factor in producing the present volume of stock is a necessary inference from all the testimony. For these reasons the capital stock cannot be taken as truly representing the value of the corporate property in a proceeding where the inquiry as to its value is made for the purpose

of ascertaining whether certain rates prescribed by the legislature for yarding and feeding cattle are reasonable or unreasonable. The fact that the state possesses the power to prescribe a maximum charge for such services necessarily prevents the court from giving as much weight to the possible income-producing capacity of the property in controversy as it might give if the stock-yards company was vested with the right to charge as much for such services as it thought proper. Neither can the opinion of certain experts as to the value of said property be regarded as reliable, much less as conclusive, because such opinions are doubtless based to a considerable extent on the income which the property can be made to yield, and upon the assumption that the owner has the right to determine what price he will charge for the use of his property. Upon the whole, therefore, the court concludes that the value of the property used for stock-yards purposes, as assessed by the master, is not unreasonable, considering the object for which such valuation was made, and that no sufficient reasons have been shown for disturbing the finding of the master on that issue.

4. The value of the property used for stock-yards purposes, as fixed by the master, including the value of certain supplies of feed and other materials which were on hand December 31, 1896, is $5,388,003. The gross income realized by the stock-yards company during the year 1896, which may be taken as representing its average gross income, was $1,012,271.22. The total expenditures of the company for all purposes during the same period amounted to $535,297.14, which would indicate a net income for the year of $476,984.08. A controversy arises, however, as to the nature of some of the expenditures for that year. It is claimed on the one hand, but denied on the other, that the operating expenses for the year 1896, such as may properly be charged to the profit and loss account, amounted to $365,712.49, instead of $535,297.14; the difference between the two amounts, $169,584.65, consisting of money which was expended in making new and permanent improvements, which added by that amount to the value of the property, and for that reason should not be treated as operating expenses, in computing the net profits. With respect to this contention the court has reached the following conclusion: A very large part of the sum last mentioned (all of it, in fact, except about $6,000) was expended in building new structures and making permanent improvements, which increased the value of the company's property to the extent of such expenditures, and therefore cannot be regarded as operating expenses, in estimating the net profits. The company itself took that view of the question, by charging them to construction account; and in due season it would doubtless have capitalized the amount of such expenses by issuing stock therefor, as it had previously capitalized other expenses of a similar character. At the same time, as buildings, pens, pavements, and other similar structures deteriorate in value somewhat from year to year, even where they are repaired in the ordinary way, it is eminently proper, in estimating the net profits, to set aside annually out of the gross income a certain sum to cover such depreciation. The testimony does not show with any great degree of accuracy what sum should be thus

set apart annually in addition to the cost of ordinary repairs, but as the sum of $32,309 appears to have been expended in the year 1896 for ordinary repairs, which sum was charged to the profit and loss account, under that head, the court concludes that the sum of $50,000 is an adequate amount to cover the annual loss from deterioration, not made good by ordinary repairs. Fifty-six thousand dollars has accordingly been deducted from the sum of $169,584.65 charged to construction account, and the balance of that sum has been added to the net profits. The result is that the net income for the year 1896 was $476,984.08 plus $113,584.65, originally charged to construction account, or, in the aggregate, $590,568.73. If the rates prescribed by the Kansas statute for yarding and feeding stock had been in force during the year 1896, the income of the stock-yards company would have been reduced that year to the extent of $300,651.77, leaving a net income of $289,916.96, on the assumption (which is a very reasonable one) that its expenses would have remained a constant quantity, and that the volume of its business would not have been sensibly increased by the reduction in rates. Its income would thus have been adequate to yield a return of 5.3 per cent. on the value of the property used for stock-yards purposes, as fixed by the master, or 4.6 per cent. on the sum for which the property has been capitalized; first deducting from that sum the value of all property represented by the capital stock which is not used for stock-yards purposes.

5. Conceding, as we must, that the legislation complained of was radical in its nature and effect, that it reduced the company's income about 50 per cent., and that it prevents it from realizing on the capital invested in its plant such a per cent. as is ordinarily realized on capital invested in other mercantile and business enterprises, still the court is not prepared to hold that the statute is confiscatory, and that it deprives the company of its property without due process of law. It is common knowledge that large sums of money are invested in securities which do not yield a return exceeding 5 per cent. on the investment, and it is further manifest that the business of the stock-yards company, as conducted, is not subject to the same risks of loss from bad debts and declining prices which affect many other business enterprises. Moreover, legislative enactments cannot be declared void because the courts entertain doubts of their expediency or validity, or because such enactments tend to lessen the valuation which has theretofore been placed on certain private property. In a great variety of ways, laws which cannot be challenged have an inevitable tendency to affect injuriously the value of property. The power of the state to fix the maximum price that shall be charged for the use of property affected with a public interest necessarily implies the power to lessen its value somewhat, or at least to lessen it as measured by the income which it might be made to produce if free from public control. In the very nature of things, considerable scope must be given to legislative discretion in determining the validity of statutes like the one now in question, since the judiciary have no power to prescribe a schedule of maximum rates, and it is only where there has been a clear abuse of power,—where the rates prescribed by a statute are manifestly unreasonable, and operate to deprive a citi-

zen or corporation of that which justly belongs to them, even as against the public,—that the courts have power to intervene. We are constrained to hold that the case at bar is not of that character.

6. The great importance of the questions involved in these cases will doubtless occasion an appeal to the supreme court of the United States, where they will be finally settled and determined. If, on such appeal, the Kansas statute complained of should be adjudged invalid for any reason, and in the meantime the statutory schedule of rates should be enforced, the stock-yards company would sustain a great and irreparable loss. Under such circumstances, as was said, in substance, by the supreme court in Hovey v. McDonald, 109 U. S. 150, 161, 3 Sup. Ct. 136, it is the right and duty of the trial court to maintain, if possible, the status quo pending an appeal, if the questions at issue are involved in doubt; and equity rule 93 was enacted in recognition of that right. The court is of opinion that the cases at bar are of such moment, and the questions at issue so balanced with doubt, as to justify and require an exercise of the power in question. Therefore, although the bills will be dismissed, yet an order will at the same time be entered restoring and continuing in force the injunction which was heretofore granted, for the term of 10 days, and if, in the meantime, an appeal shall be taken, such injunction will be continued in force until the appeal is heard and determined in the supreme court of the United States: provided that, in addition to the ordinary appeal bond, the Kansas City Stock-Yards Company shall make and file in this court its bond in the penal sum of $200,000, payable to the clerk of this court and his successors in office, for the benefit of whom it may concern, conditioned that, in the event the decree dismissing the bills is affirmed, it will, on demand, pay to the party or parties entitled thereto all overcharges for yarding and feeding live stock at its stock yards in Kansas City, Kan., and Kansas City, Mo., which it may have exacted in violation of sections 4 and 5 of the Kansas statute relative to stock yards, approved March 3, 1897, since an injunction was first awarded herein, to wit, on April ———, 1897, and that it will in like manner pay such overcharges, if any, as it may continue to exact in violation of said statute during the pendency of the appeal; said obligation to become void if the statute in question shall be pronounced invalid by the supreme court.