RAILROAD COMMISSION OF TEXAS ET AL V. HOUSTON NATURAL GAS CORPORATION

No. A-5557. Decided March 21, 1956.
Rehearing overruled May 9, 1956.
(289 S.W. 2d Series 559)

*John Ben Shepperd,* Attorney General of Texas and *Mert* *Starnes,* Assistant Attorney General, for the Railroad Commission, *A. Guy Crouch,* City Attorney of Alvin and *C. K. Richards,* of Austin for appellants.

The trial court erred as a matter of law, in granting the motion for summary judgment; also in holding that the Railroad Commission, in basing its order fixing the rates to be

charged on the book valuation of plaintiff's plant and properties and failed to give effect to any other evidence of valuation, and that there was no genuine issue as to the controlling material facts. Snoddy v. Gage, 5 Texas 106; Paragon Oil Syndicate v. Rhodes Drilling Company, 115 Texas 149, 277 S.W. 1036; Colorado Gas Co. v. Federal Power Commission, 324 U.S. 581, 65 Sup. Ct., 829, 89 L. Ed. 1206.

*Looney, Clark & Moorhead, Everett Looney, R. Dean Moorhead,* all of Austin, *Fulbright, Crooker, Freeman, Bates & Jaworski, Hugh Q. Buck* and *Leon Jaworski, L. Keith Simmer, Jackson C. Hinds,* and *Jefferson D. Giller,* all of Houston, for appellee.

Cited Lone Star Gas Co. v. State, 137 Texas 279, 153 S.W. 2d 681; Railroad Commission v. Weld & Neville, 96 Texas 405, 73 S.W. 760; Gulbenkian v. Penn, 151 Texas 412, 252 S.W. 2d 929.

MR. JUSTICE WILSON delivered the opinion of the Court.

The problem here is to give the capital invested in public utilities the attributes of property protected by constitutional due process in a situation where there is in fact generally no competition, no true barter and sale, and the business operates under governmental regulation. During the last three-quarters of a century the judicial effort to cast this problem in legal terms which will meet the test of confiscation under the Federal Due Process clause has absorbed some of the best efforts of the great operative minds of our law. A few of these are Gray, Holmes, Hughes, Learned Hand, Brandeis, and Jackson.

Starting in 1877 with Munn v. Illinois, 94 U.S. 113, 24 L. Ed 77, and coming down through Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 600, 64 Sup. Ct. 281, 88 L. Ed. 333, in 1943, the chain of cases reflect a basic shift in the content of the federal constitutional definition of the property rights of a public utility. The specific law questions for decision in this case are rather narrow. The questions: (1) when used for fixing a domestic gas utility rate, do the statutory words "fair value" mean the original cost of the utility company's property or something else? (2) How is the rate of return determined? The questions may be narrow, but the dilemmas underlying the words are as puzzling as any in the law.

This suit was brought under the provisions of Art. 6059

V.C.S. to set aside an order of the Railroad Commission of Texas fixing new domestic gas sales rates for the City of Alvin, Texas. Previously the company had applied to the city under Art. 1124, V.C.S. for an increase in domestic gas rates. The city refused the increase and the company appealed to the Commission under the provisions of Art. 6058, V.C.S. The Commission heard evidence from both the company and the city and then found that the rates theretofore in effect did not provide a fair return upon the fair value of the company's properties used and useful in servicing the public in the city. As the City of Alvin is a small city and as the plaintiff utility operates over a large area containing many towns and cities, only a small fraction of the utility's operation is under scrutiny here. The city contended before the Commission that the fair value rate base should be $141,956.75. Upon evidence the Commission made a finding that the fair value of the company's property used and useful in the city was $154,288.55. Here the Railroad Commission has found the fair value to be largely equivalent to the book cost. These are taken from the company books and are original cost less depreciation reserve, plus a figure of about $12,518.60 for an appreciation in 1928. The company disagreed with this valuation claiming a fair value of $215,000.00 in 1951, $230,000.00 in 1952, $240,000.00 in 1953, and $250,000.00 in 1954. The Commission then promulgated a schedule of rates which would make an estimated return of 6.12% on its valuation. The utility claims that any rate paying a return of less than 7% on the present fair value is unjust and unreasonable. The utility brought this suit as plaintiff against the Railroad Commission as defendant and the City of Alvin intervened.

The company filed a motion for summary judgment which was contested by the Commission and the city. The trial court sustained the motion for summary judgment and granted a permanent injunction prohibiting the enforcement of the new rate order and the Railroad Commission and City of Alvin have elected to try a direct appeal to this court under § 3b of Art. 5, Texas Constitution, and Art. 1738-a, V.C.S. They contend that the trial court erred in granting a summary judgment because "There exist disputed issues of controlling material fact" which are: (1) the present fair value, and (2) a fair rate of return.

■ It is fundamental that in Texas the fixing of domestic utility rates is a legislative function of the state government and cities have no inherent power apart from statute to fix utility rates. Texas Louisiana Power Co. v. City of Farmersville, Texas Com. App. 1933, 67 S.W. 2ᵈ 935. Utility rates as rules of con-

duct are prospective only and do not in any manner involve an "adjudication" of rights arising from a "past" controversy. It is true that the fixing of rates requires a study of existing and past facts, but the rate as promulgated is not "res adjudicata" of any fact so studied. Therefore our primary concern in this type of case is to examine, construe, and apply existing legislation.

■ A state legislature may fix the actual rate itself or it may delegate the fixing of the rate to a subordinate body. It may delegate the fixing of the rate while itself prescribing rules and standards to govern and guide the subordinate body. A host of authority supports this: We cite one: City of Knoxville v. Knoxville Water Co., 212 U.S. 1, 53 L. Ed. 271, 29 Sup. Ct. 148, 150, where the court said:

"* * * The purpose of this suit is to arrest the operation of a law on the ground that it is void and of no effect. It happens that in this particular case it is not an act of the legislature that is attacked, but an ordinance of a municipality. Nevertheless the function of ratemaking is purely legislative in its character, and this is true, whether it is exercised directly by the legislature itself or by some subordinate or administrative body, to whom the power of fixing rates in detail has been delegated. The completed act derives its authority from the legislature and must be regarded as an exercise of the legislative power. Prentis v. Southern R. Co., 211 U.S. 210, 29 Sup. Ct. 67, 53 L. Ed. 150; Honolulu Rapid Transit & Land Co. v. Hawaii, 211 U.S. 282, 29 Sup. Ct. Rep. 55, 53 L. Ed. 186 * * *."

■ In Texas the legislature has delegated the power to fix gas rates, in the first instance, to the cities with the provision that a dissatisfied party may transfer this legislative function from the city to the Texas Railroad Commission by an appellate process. While the idea of an appeal from one legislative body to another has novelty, its constitutionality has been upheld. Texas Natural Gas Utilities v. City of El Campo, Texas Civ. App. 1939, 135 S.W. 2d 133, Certiorari denied, 310 U.S. 629, 60 Sup. Ct. 977, 84 L. Ed. 1400. We hold that when the Railroad Commission promulgates a rate appealed to it from a city under Art. 6058, it is governed by and acts within the legislative delegation contained in Arts. 1119 and 1124, V.C.S.

Neither the Railroad Commission nor the City has issued any rules on this subject so the source of the legislation to be considered here is:

1. The acts of the legislature.

2. The actual rate prescribed and under attack.

Such a case then resolves itself into two major questions, which are:

1. Is the prescribed rate constitutional as legislation?

2. Did the ratemaking body stay within the scope of the legislative authority delegated to it?

In approaching the first question we apply the same constitutional test to a utility rate that we would to any other legislation. In discussing railroad freight rates, it was pointed out in 1928 in Missouri K. & T. Ry. Co. v. Railroad Commission of Texas, Texas Civ. App. 1928, 3 S.W. 2d 489, 494, affirmed 13 S.W. 2d 679, that:

"Rate making is essentially a legislative function, and operates prospectively. Railroad Commission v. Weld & Neville, above (96 Texas 405, 73 S.W. 532); Prentis v. Atlantic Coast Line Co., 211 U.S. 226, 29 Sup. Ct. 67, 53 L. Ed. 158, 159, and authorities there cited. And the same is true of many rules and regulations within the delegated powers of the Commission. Rate making has been delegated to the Railroad Commission alone, and its acts in that regard have the force and effect of statutes, and are subject to review to the extent only that statutes of the same import are so subject, with the additional power which articles 6657 and 6658 confer upon the courts to determine whether a rate, etc., is unreasonable or unjust to the party complaining."

■ In testing the constitutionality of a rate for other than procedural due process, we look to the end product of the legislation. We do not look to the factual inquiry made by the City or the Railroad Commission to any greater extent than we would look at the factual material and testimony given before a Committee of the House of Representatives if that body had elected to fix this very rate by statute instead of delegating this duty as it has done. Under certain limited circumstances, factual material introduced before a legislative body may be used to throw light upon legislative intent, but we wish to emphasize that the deliberations and end product of both the City Council and the Railroad Commission are legislative in character and not judicial. However, in the case at bar we have the testimony

before the Commission filed as affidavits supporting and contesting the motion for summary judgment. We will consider them in that regard only.

■ The cases of United Gas Public Service Co. v. State, 303 U.S. 123, 625, 58 Sup. Ct. 483, 82 L. Ed. 702, and Lone Star Gas Company v. State, 304 U.S. 224, 58 Sup. Ct. 883, 82 L. Ed. 1304, have settled the proposition that the owner of property used in the public interest as a public utility is as a matter of law entitled not only to keep all of the property that he starts out with but also to make a return as income upon his property. The amount of the return—say whether it be 4% or 7%—seems to be largely a matter of legislative judgment so long as it is not confiscatory. There is no claim made here that the rate of return of 6.12% fixed by the Commission is confiscatory in itself as a rate of return. The company does claim that any rate below 7% is unreasonable and that the actual return here is 4.61% and that this is confiscatory. The company arrives at 4.61% by taking the estimated net operating income of $9,439.63 and applying it against *its* estimation of fair value instead of the Commission's estimate. The courts have generally said that a percentage of return substantially below the going market for that type of capital is confiscation. The fixing of the percentage of return necessary to induce capital is regarded as a fact question to be determined upon evidence from the stock market and from investment experts. We will discuss this again later in the opinion.

One of the most difficult constitutional questions often discussed in cases involving this type of legislation is whether or not the company has been accorded procedural due process. See United Gas Public Service Co. v. State, supra. This matter of procedural due process frequently overlaps the question of the subordinate body staying within its delegated authority, but in the case at bar we have no question of procedural due process. There is no attack made on the procedural steps taken in promulgating the rate, and there are no allegations of a denial of notice and hearing.

The earliest cases such as Dow v. Beidelman, 125 U.S. 680, 8 Sup. Ct. 1028, 31 L. Ed. 841, treated "price fixing" as entirely legislative with the remedy for error or abuse lying exclusively at the polls. The cases before the turn of the century assume that the public has little interest in the capital structure of a utility but that each city and town was concerned with providing a regulated return upon the investment in the inventory of the

physical property devoted to the public service. In 1890, in Minneapolis Eastern Railway Co. v. The State of Minnesota, 134 U. S. 467, 10 Sup. Ct. 473, 33 L. Ed. 985, it was asserted that price fixing was one method of taking the content out of property and that Federal Due Process required that price fixing must be reasonable as "judicially determined." From this the courts evolved the property rate base as a method of calculating utility rates, and the courts made a great effort to give each piece of physical property inventoried all the constitutional guarantees of property. Since the owner of property had a right to have it fluctuate with the economic cycles, values had to be *present value*. Original cost (less depreciation) was frequently rejected as depriving the utility of *property in the thing*. But since most utilities had a monopoly and were not restrained by competition they had to be regulated lest they overcharge the public. One writer has stated this early dilemma troubling the courts as "How can the state court possibly deny to the owner the power to make as much money from his property as he had anticipated without destroying some portion of the value of that property?"—Hale, "Does the Ghost of Smyth v. Ames Still Walk?", 55 Harv L. Rev. 1116. But now the fact that any regulation at all takes some of the value out of utility property has ceased to bother the courts. Also, with the Hope case the concept of maintaining through the rate structure the integrity of property rights in *physical things* has disappeared as a requirement of Federal Due Process.

Another thing this series of cases reveals is an increasing judicial confidence in—or, perhaps, a decreasing fear of—authoritative administrative government. This was accompanied by a corresponding decrease in effort to apply the separation and division of powers doctrine. Perhaps property rights and the judicial remedy to enforce them have always been the same thing, but with the double debut of the "Prudent Investment" method of calculating a utility's returns and the "substantial evidence rule" as a method of judicial review, the constitutional position of public utilities drastically changed.

■ The first problem presented in this case—and perhaps the most persistently troublesome problem in the whole field of utility regulation—is in determining the value of the capital upon which the return is to be calculated. Stated legally, this first problem is: Do the Texas statutes require that utility rates be based upon a property valuation such as land, trucks, tools, meters, typewriters, gas mains, etc.? Can they be based upon the Prudent Investment theory? We hold that the Texas statutes

require a physical property valuation rate base. Then, our second question becomes: How is a property valuation determined?

Professional economists have never been able to work out a general theory of economic value which is not susceptible to attack and criticism. The vast quantity of legal writing on the judicial effort to evolve formulas for evaluating the property of utility companies would indicate that the courts may not have had much more success than the professional economists. We will not labor the great array of case material which has been worked and reworked so extensively in both judicial, textual, and Law Review writing, but, because of the vast amount of material on this subject, we will attempt to outline only the bare profile of the peaks and valleys of judicial thinking. We do this not to rehash what has been said many times but to demonstrate the background against which the relevant Texas statutes should be construed.

These statutes are:

(1)  Art. 1119, originally enacted in 1907 and amended in 1937. As presently worded this delegates to general law cities the power "to regulate, by ordinance, the rates and compensation" allowed a utility. It prohibits any rate "which will yield more than a fair return upon the fair value of the property used and useful in rendering its service to the public, but which return in no event shall ever exceed eight (8) per cent per annum."

(2)  Art. 1124, enacted in 1921. This provides that a city "shall in determining, fixing, and regulating" utility rates "base the same upon the fair value of the property * * * devoted to furnishing service * * * and not upon any stocks or bonds issued or authorized to be issued, by, or any other indebtedness of" the utility.

At the outset we urge the reading of the first eight pages of Utah Power & Light Co. v. Public Service Commission, 107 Utah 155, 152, Pac. 2d 542. In this case will be found an extremely able and terse summary of the long road from the Munn case to the Hope case. Because this is available, we will not duplicate it. For a general background on Texas regulation of gas utilities, see Marshall Newcomb, "Some Aspects of Regulation of Public Utilities Operating in the State of Texas," 5 Baylor Law Review 335.

An early leading case came shortly after the deflation panic of 1893 in which prices had fallen to the lowest level of the century. Steenerson v. Great Northern Ry. Co., 69 Minn. 353, 72 N.W. 713, 715 involved the problem of evaluating railroad property acquired before the then current depression. The railroad sought to maintain rates based upon original cost of its properties which were of course much higher than the then replacement cost. However, the court ruled that the rates should be based upon present value and not upon original cost.

The courts of this period probably shared the widespread popular belief that there then existed a practice in railroad and utility circles of padding cost and that the purchasing practices were sometimes corrupt so that many items actually cost the company more than they should have. This is further complicated by the fact that in many of the later cases the cost to the present owner may be a figure more or less arbitrarily fixed in some previous foreclosure or corporate reorganization. See San Diego Land & Town Co. v. Jasper, supra. Then too, the courts did not want to charge the public with the mistake "even though honest" of the utilities. Stanislaus County v. San Joaquin Canal & Irrigation Co., 192 U.S. 201, 24 Sup. Ct. 241, 48 L. Ed. 406.

In 1898 similar economic conditions of deflation were projected before the Supreme Court of the United State in Smyth v. Ames, 169 U.S. 466, 18 Sup. Ct. 418, 434, 42 L. Ed. 819. Again the railroad losts its contention that the rates should be based upon original cost. The court laid down the famous Smyth v. Ames test. In defining fair value the court made the often quoted statement:

"* * * And, in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. * * *"

In 1899 a federal court in San Diego Land & Town Co. v. National City, 74 Fed. 79, affirmed 174 U.S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154, recognized that the equity capital in a public utility was entitled to rise and fall with the economic

cycle and that if the rate of return were based upon the original cost of the property the equity ownership would be permanently fixed just as it is in the case of a secured bonded indebtedness. And this, of course, without the advantage of security. In affirming this case the Supreme Court put the result squarely upon Smyth v. Ames, supra. Another expression of this same thought will be found in Cotting v. Kansas City Stock Yards Co., 82 Fed. 850, reversed on other grounds, 183 U.S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92. In 1903 in the case of San Diego Land & Town Co. v. Jasper, 189 U.S. 439, 23 Sup. Ct. 571, 47 L. Ed. 892, the Supreme Court reaffirmed its test of present value as against actual cost and again in 1904 in Stanislaus County v. San Joaquin Canal & Irrigation Co., 192 U.S. 201, 24 Sup. Ct. 241, 48 L. Ed. 406.

To keep the chronology straight, we point out here that Art. 1119 was enacted by the Texas Legislature in 1907 using actual cost.

In 1909 in two cases (City of Knoxville Water Company, 212 U.S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371, and Willcox v. Consolidated Gas Co., 212 U.S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, the United States Supreme Court reiterated its test of present value using reproduction cost less depreciation as part of the definition. Also in the Knoxville case rates based upon the capitalization of the company were rejected because of the possibility of chicanery in issuing stock. In 1912 reproduction cost was again before the Supreme Court in Lincoln Gas & Electric Co. v. City of Lincoln, 223 U.S. 349, 32 Sup. Ct. 271, 56 L. Ed. 466, and in 1913 this test was used in the famous Minnesota Rate Cases (Simpson v. Shepard, 230 U.S. 352, 33 Sup. Ct. 729, 762, 57 L. Ed. 1511). Here again the court recognized the fluctuating nature of the risk capital. The court said:

"It is clear that in ascertaining the present value we are not limited to the consideration of the amount of the actual investment. If that has been reckless or improvident, losses may be sustained which the community does not underwrite. As the company may not be protected in its actual investment, if the value of its property be plainly less, so the making of a just return for the use of the property involves the recognition of its fair value if it be more than its cost. The property is held in private ownership, and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law. But still it is property employed in a public calling, subject to governmental regulation, and while,

under the guise of such regulation, it may not be confiscated, it is equally true that there is attached to its use the condition that charges to the public shall not be unreasonable. And where the inquiry is as to the fair value of the property, in order to determine the reasonableness of the return allowed by the rate-making power, it is not admissible to attribute to the property owned by the carriers a speculative increment of value, over the amount invested in it and beyond the value of similar property owned by others, solely by reason of the fact that it is used in the public service. That would be to disregard the essential conditions of the public use, and to make the public use destructive of the public right."

This test was again applied in 1918 in City and County of Denver v. Denver Union Water Co., 246 U.S. 178, 38 Sup. Ct. 278, 62 L. Ed. 649.

In 1921 Texas Art. 1124 was passed.

About this time the valuation of physical property as a rate base began to come under searching inquiry and much criticism. This was reflected in the decisions of the United States Supreme Court.

In 1922 Mr. Justice Brandeis wrote the opinion in Galveston Electric Co. v. Galveston, 258 U.S. 388, 42 Sup. Ct. 351, 353, 66 L. Ed. 678. This case involved an attack upon a 1919 City of Galveston ordinance. The court does not discuss Art. 1119 and of course Art. 1124 had not been passed when the case arose. The City of Galveston had a special charter. The court said:

"* * * The experts agreed on what they called the estimated undepreciated cost of reproduction on the historical basis; that is, what the property ought to have cost on the basis of prices prevailing at the time the system and its various units were constructed. * * *"

Mr. Justice Brandeis mentions the prudent investment theory which had been developing in Massachusetts and on which he was to elaborate the next year but held that a rate paying a fair return on "present reproduction value" was not confiscatory.

In 1923 the Supreme Court emphasized that one element of fair value is "reproduction cost new." Missouri ex rel S. W. Bell

Tel. Co. v. Public Service Commission, 262 U.S. 276, 67 L. Ed. 981, 43 Sup. Ct. 544, 545, 31 A.L.R. 807. It is in a concurring opinion in this case that Mr. Justice Brandeis made his famous attack upon the "so-called rule of Smyth v. Ames" as being "legally and economically unsound." Here he advocates fully the "prudent Investment Theory" which may be briefly stated as the belief that Federal Due Process does not protect the value of the physical property used by a utility but only the capital honestly and prudently invested in the enterprise. Because it is contended here that the "Smyth v. Ames rule" was enacted into statute in Texas by the legislature's use of the words "fair value," it is well again to call attention to Mr. Justice Brandeis' criticism (although often quoted). We quote:

"* * * * * * The experience of the twenty-five years since that case was decided has demonstrated that the rule there enunciated is delusive. In the attempt to apply it insuperable obstacles have been encountered. It has failed to afford adequate protection either to capital or to the public. It leaves open the door to grave injustice. * * *

"The rule of Smyth v. Ames sets the laborious and baffling task of finding the present value of the utility. It is impossible to find an exchange value for a utility, since utilities, unlike merchandise or land, are not commonly bought and sold in the market. Nor can the present value of the utility be determined by capitalizing its net earnings, since the earnings are determined, in large measure, by the rate which the company will be permitted to charge; and thus the vicious circle would be encountered. So, under the rule of Smyth v. Ames, it is usually sought to prove the present value of a utility by ascertaining what it actually cost to construct and install it; or by estimating what it should have cost; or by estimating what it would cost to reproduce, or to replace, it. To this end an enumeration is made of the component elements of the utility, tangible and intangible: then the actual, or the proper, cost of producing, or of reproducing, each part, is sought: and finally, it is estimated how much less than the new each part, or the whole, is worth. That is, the depreciation is estimated. Obviously, each step in the process of estimating the cost of reproduction or replacement involves forming an opinion, or exercising judgment, as distinguished from merely ascertaining facts. And this is true, also, of each step in the process of estimating how much less the existing plant is worth than if it were new. There is another potent reason why under the rule of Smyth v. Ames, the room for difference in opinion as to the present value of a

utility is so wide. The rule does not measure the present value either by what the utility cost to produce, or by what it should have cost, or by what it would cost to reproduce or to replace it. Under that rule the tribunal is directed, in forming its judgment, to take into consideration all those, and also other elements, called relevant facts.

"Obviously, 'value' cannot be a composite of all these elements. Nor can it be arrived at on all these bases. They are very different and must, when applied in a particular case, lead to widely different results. The rule of Smyth v. Ames, as interpreted and applied, means merely that all must be considered. What, if any, weight, shall be given to any one, must practically rest in the judicial discretion of the tribunal which makes the determination. Whether a desired result is reached may depend upon how any one of many elements is treated. It is true that the decision is usually rested largely upon records of financial transactions, on statistics and calculations. But, as stated in Louisville v. Cumberland Teleg. & Teleph. Co. 225 6.S. 430, 436, 56 L. Ed. 1151, 1152, 32 Sup. Ct. Rep. 741, 'every figure * * * that we have set down with delusive exactness' is 'speculative.' "

\* \* \*

"* * * For the rule not only fails to furnish any applicable standard of judgment, but directs consideration of so many elements that almost any result may be justified."

In advocating the Prudent Investment theory he argued that the period of widespread chicanery in the issuance of utility stocks and bonds had largely passed but subsequent events did not bear out this prophesy. However, the Prudent Investment theory has won wide acceptance in the thirty years which have passed since this concurring opinion was delivered.

In 1926, in the case of McCardle v. Indianapolis Water Co., 272 U.S. 400, 47 Sup. Ct. 144, 71 L. Ed. 316, the court recognized that the ownership of a utility should fluctuate with the economic cycles. The court said:

"It is well established that values of utility properties fluctuate, and that owners must bear the decline and are entitled to the increase. The decision of this court in Smyth v. Ames, 169 U.S. 466, 547, 42 L. Ed. 819, 849, 18 Sup. Ct. Rep. 418, declares that to ascertain value 'the present as compared with the original cost of construction' are, among other things, matters for consideration. But this does not mean that the original

cost or the present cost or some figure arbitrarily chosen between these two is to be taken as the measure. The weight to be given to such cost figures and other items or classes of evidence is to be determined in the lights of the facts of the case in hand. * * *"

In 1933, in Los Angeles Gas & Elec. Corp. v. Railroad Comm., 289 U.S. 287, 53 Sup. Ct. 637, 77 L. Ed. 1180, the court again emphasized the equity nature of the right of property in a utility. The court said:

"The actual cost of the property—the investment the owners have made—is a relevant fact. Smyth v. Ames, 169 U.S. 466, 547, 42 L. Ed. 819, 849, 18 Sup. Ct. 418. But while cost must be considered, the Court has held that it is not an exclusive or final test. The public have not underwritten the investment. The property, on any admissible standard of present value, may be worth more or less than it actually cost. The time and circumstances of the outlay, and the effect of altered conditions demand consideration. * * *"

In 1934 came Lindheimer v. Illinois Bell Telegh. Co., 292 U.S. 151, 54 Sup. Ct. 658, 78 L. Ed. 1182, and in 1938 came the case of United Gas Public Service Co. v. Texas, 303 U.S. 123, 58 Sup. Ct. 483, 82 L. Ed. 702.

In 1942 in the case of Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 62 Sup. Ct. 736, 86 L. Ed. 1037, the Supreme Court rejected "going concern" value as a requirement of Federal Due Process and held that the words "just and reasonable" as used in the Natural Gas Act did not mean the same as "fair value" as used in the cases discussed above. It is in this case that a concurring opinion attempted to "lay the ghost" of Smyth v. Ames. This case is said to be "a further step in the path of leading to the principle declared by the court in the Munn case to have existed from time immemorial that regulation of public utilities was a 'legislative prerogative and not a judicial one.'" "The Scope of Judicial Review of Rate Regulation," (Comment), 39 Illinois Law Review 160, 167.

In 1943 in the case of Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 600, 64 Sup. Ct. 281, 88 L. Ed. 333, the court held that under the statutory standard of "just and reasonable" as used in the Natural Gas Act "it is the result reached and not the method employed which is controlling." "* * * And he who would upset the rate order under the Act

carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences."

Section 19(b) of 15 U.S.C.A. (Natural Gas Act) provides that judicial review shall be under the substantial evidence rule. Our impression of the Hope case is that in the main its discussion of judicial review is a statement of the substantial evidence rule.

The effect of the Hope case is that under Federal Due Process a state is free to use whatever valuation principle it determines is best suited to its needs.

One writer has summarized the general effect of the Hope case on state decisions as follows:

"The state decisions since *Hope* may be grouped into four categories: (1) those continuing their pre-*Hope* policy of original cost or prudent investment; (2) those faithful to the fair value rule despite the opportunity offered by *Hope;* (3) those adopting a cost method, though ostensibly adhering to the fair value rule; (4) decisions explicitly adopting either original cost or prudent investment as a result of *Hope."* Joseph R. Rose, "Hope Case and Public Utility Valuation in the States" 54 Columbia Law Review 188.

Some of the criticism of the "cost" approach to ratemaking has been summarized as:

"The 1920's, a period of rapid turnover and consolidation, particularly in the electric and gas fields, brought to the fore the problem of what cost to the accounting company might represent in the public utility field. The state commissions were faced with constant increase in book costs as properties were transferred, sometimes at arm's length, and sometimes in purely formal 'sales' between affiliates at prices dictated by those in control. At the best, purchase prices were amounts paid for expected earning power, and the regulatory commissions could get little help; in bringing a developing industry under effective control from books of accounts in which cost represented capitalized earnings expectations. At the worst, purchase costs represented factors even less meaningful than earnings expectancies. In addition to purchases of 'location' for reasons of optimism, properties were bought preclusively to shut out competitors and to protect 'frontiers.' They were bought so that

those in control could use them as the basis for security issues with fees to affiliated underwriters, and could subject them to grossly excessive 'service' fees paid to affiliated service companies." Homer Kripke, "A Case Study in the Relationship of Law and Accounting: Uniform Accounts 100.5 and 107," 57 Harvard Law Review 442.

This same writer points out that in a competitive field of business endeavor reproduction costs new amounts to another method of capitalizing earnings. He says:

"* * * Reproduction cost, the point which has been suggested as marking the dividing point between tangible and intangible items, can have little or no theoretical significance in determining the value at which a public utility property will be bought and sold. In economic theory as to values in competitive enterprise, reproduction cost is merely an upper limit to values determined ultimately by earning power: it marks the point at which a purchaser would choose to build rather than buy; to a less definite degree, it marks the point at which other producers would come into the market, increase the supply, and invalidate the earnings estimates. The economic theory does not work in the public utility field, for, apart from its former effect on the rate base, reproduction cost of the physical property can have no significant bearing on value in a monopoly industry whose earnings are regulated. During the 'fair value' era the courts tended to accept very high reproduction cost estimates and 'going values,' creating rate bases so high that the companies as a matter of business judgment did not always attempt to earn a 'fair' return on them. Accordingly, purchase prices tended to reflect earnings expectancies rather than any realistic estimates of reproduction cost. We come back to the fact that we are in the vicious circle again. People paid what they thought the property was worth on an earnings basis, not what they thought it would cost to reproduce. * * *"

In the case of Niagara Falls Power Co. v. Federal Power Commission, 137 Fed. 2d 787 (1943), cert. denied, 320 U.S. 792, 64 Sup. Ct. 206, 88 L. Ed. 477, Judge Learned Hand points out that if cost be determined by a sale or resale of an existing property the court will again be capitalizing earnings based on the rates as of the time of sale. Obviously, this penalizes the owner who keeps his property and tends to produce a churning of public utility property for the purpose of driving up the rates.

The fundamental difference between "cost" and "value" is pointed out by another writer:

"* * * Yet it should be obvious that the factors which compose 'cost' and 'value' are not synonymous and that the concepts must not be confused. Strong testimony to this effect was given by C. W. Smith, Chief of the Accounts, Finance, and Rates Division of the Federal Power Commission in the *Arkansas Power & Light Co.* case:

" 'I agree that values are in a state of flux and I don't think any accountant would argue that cost represents value. Cost represents cost. I don't claim that cost represents value. I believe that value, however, is an unnecessary process in the fixing of rates * * * I agree that the value of any property is the present worth of what it will earn in the future. I agree, too, that the value of physical properties of a business which is not earning money is scrap value.'

"There is no doubt that both appreciation and depreciation of property materially affect values; but they cannot possibly alter the figure of actual original property cost. Cost and value may indeed be identical at the date of construction. But except through the fortuitous circumstances that appreciation exactly offset depreciation in the case of a particular property, cost and value could never be identical in subsequent years. Consequently, when cost is substituted for value as the basis for regulation, it necessarily follows that depreciation, i.e., loss in value—no longer should be taken into consideration, unless it has gone so far as to bring about either withdrawal of a particular piece of property from service, or its classification as no longer 'used and useful.' " Samuel Ferguson, " 'Cost' as a Substitute for 'Value' in Utility Rate Base Determination: A Comment on Dr. Bauer's Position," 53 Yale Law Journal 723, 724.

Against this background we will now consider the Texas statutes. The Texas Legislature in 1907 enacted present Art. 1119. As originally enacted it authorized the regulation of utility rates with the proviso that:

"* * * the City Council or Board of Aldermen shall not prescribe any rate or compensation which will yield less than ten (10%) per cent per annum net on the actual cost of the physical properties, equipments and betterments." Chap. CXVII, Acts 30th Leg. 1907, p. 217, Vol. 13, Laws of Texas."

In 1931 the legislature attempted an amendment changing the 10% from a minimum to a maximum yield, but because of defective caption this was declared unconstitutional in Texas-Louisiana Power Co. v. City of Farmersville, supra.

Certainly there seems to have existed considerable dissatisfaction with the "cost" approach for in 1937 the Texas Legislature amended Art. 1119 by substituting "fair value" for "actual cost of physical properties." During the period between 1921 and 1937 the two statutes can be reconciled if need be on the basis that during that period Art. 1119 merely fixed a floor under the utility.

In his dissent in the Hope case, Mr. Justice Jackson raises the question of whether the property rate base method can be applied to a natural gas utility with predictable results since much of its capital may be invested in producing gas properties. In the case at bar the utility purchased its gas and did not produce it. In Art. 1119 the legislature provided that the rate shall not yield more than a return based upon the property "used and useful." Art. 1124 requires that the rate be based upon the value of the property "devoted to furnishing service" and not upon stocks or bonds. Clearly Art. 1119 sets a property rate base as a ceiling. We could not say that a rate based in part upon capitalization or prudent investment would violate this statute if it stayed under the ceiling as measured by a property valuation rate base. Art. 1124 commands that the rate "shall" be based upon a property valuation and "not upon" stocks and bonds issued. We therefore hold that as a matter of staying within the legislative delegation the approach in Texas must be that of using a property valuation rate base and not that of the prudent investment theory. We want it distinctly understood, however, that we are not holding a property rate base necessary under the Constitution. We do not place this holding upon constitutional confiscation but solely upon legislative delegation. The legislature may amend or repeal these statutes, if it so desires, or supplement them with more detailed rules of guidance. It may adopt some completely different approach, as, for instance, the prudent investment theory, and we will test it against the Constitution when presented.

In his dissent to the Hope case, Mr. Justice Jackson suggests that because the supply of natural gas is exhaustible and irreplaceable there is a third element which enters price fixing for a natural gas utility over and above the return to the utility and the interest of the present consumers. That is the conserva-

tion of a natural resource by price fixing to prevent the gas being squandered by one generation on very inefficient usages. One of the rate experts for the company used this "finite" aspect of the gas business as a reason for a higher rate of return than that accorded to an electric utility. The parties to this case have neither briefed nor argued that aspect of the Railroad Commission's powers and duties so we do not discuss it.

Having concluded that the legislature has prescribed that utility rates in Texas shall be based upon a return upon a property rate base and not upon the prudent investment theory, we now hold that the legislature has actually set very few limitations on the delegation of power to fix the value and the percentage rate of return.

We hold:

First, as to fixing the value: The word "fair" is vague and ambiguous and in itself affords no satisfactory test by which to choose between the complex accounting methods urged here by the parties. The cases do establish that the words "fair value" mean "present value."

■ The truth is that it is neither desirable nor practical to use the same valuation formula for all types of property used by a gas utility. The difference between valuing a two-year-old pickup truck where there can be a ready sale on an easily available market and a fifteen-year-old gas main buried under a paved street are apparent. Replacement cost new less adjustment for age and condition may or may not be close to the sales value of a secondhand truck. Where a piece of property has a sale or market value apart from and unconnected with the utility rate being fixed, this would seem to be the best criterial. The gas main may have no salvage or sale value at all. It may have value only in its use in the sale of gas. Its value for that purpose depends entirely upon the rate. For lack of any other criteria we bracket the problem of fixing a value for the gas mail as a reasonable balance between original cost less depreciation and replacement cost new less an adjustment for present age and condition. Utility regulation has recently been called a "tug-of-war between competing principles of original and reproduction cost." Joseph R. Rose—" 'Hope' case and Public Utility Valuation in the States," 54 Columbia Law Review 188, 189. In Hunt and Legg, "Public Utility Rates in Illinois: the Bell Cases," 50 Northwestern Law Review, 17, 26, it is said:

"Four different methods were used in estimating reproduc-

tion cost new. The first method was appraisal. A real estate broker appraised land, and an architect appraised buildings. The second method was 'cost trend,' applied to central office equipment—such as switchboards—and large private branch exchanges. The third method was 'unit price,' applied to outside plant, station equipment and vehicles. Finally, with respect to a very small percentage of its property—materials, supplies and property under construction—the company used original cost as reproduction cost new. * * *"

The cost of reproducing a partially obsolete plant without contemporary equipment would obviously be of no real help. The undesirability and economic waste of a system which makes it to the stockholders' interest to replace old but usable equipment with new equipment is illustrated in "Case Two" in 53 Yale Law Journal 728. On the one hand, as Mr. Justice Hughes pointed out, the original cost test deprives the equity ownership of any chance to fluctuate with changing economic conditions and makes it in fact very like a fixed indebtedness instead of an equity ownership. On the other hand, the test of reproduction cost new adjusted to actual age and condition during inflationary periods could be too large a burden on the public and during deflationary periods unfair to utility investors. So the burden of the cases is that the solution falls as a matter of judgment somewhere between these two brackets. This allows utility property to fluctuate in value but tends to even out the curve and flatten the extremes of economic cycles.

■ Where the property rate base is based in part upon an adjusted reproduction cost new, the proper treatment of depreciation is both complex and difficult. In the company's accounts at bar some depreciation is charged as an annual expense item. We have not examined it in detail and the State has not attacked this so we do not pass upon it. The item of depreciation of a given piece of property appearing in current expenses for rate purposes should be closely correlated with the "fair value" appraisal of the same piece of property from year to year, and the whole should be consistent.

Second, as to fixing the rate of return: In the absence of legislation the courts have resorted to reason for a guide and have fairly well established the rule that to avoid confiscation the rate of return must be high enough to attract ample capital but need not be beyond that. This percentage figure the trial court can determine as a fact. In 1944 one writer tersely pointed out why the percentage rate of return ought to be keyed to the

current "going price" of utility capital in the money market. He says:

"* * * The aggregate allowable return to the investor is the product of rate base and rate of return. Money rates are now far below the levels of the 1920's, and billions of dollars of public utility bonds and preferred stocks have been refunded at savings in interest and dividends. Common stockholders are the beneficiaries of the saving. If a rate of return is permitted to remain where it was for a period or is not cut as drastically as changes in money rates might warrant, the aggregate return to stockholders might be only slightly affected despite a drastic cut in the rate base." Homer Kripke, "A Case Study in the Relationship of Law and Accounting: Uniform Accounts 100.5 and 107"—57 Harvard Law Review 693.

Another article points out:

"Low rates are not the end-all of public utility regulation. Good service is at least as important. Utility customers do not truly benefit when rates are fixed so low that a utility is without reasonable assurance that it will be able to attract sufficient capital to maintain and expand its service. Capital to provide service must come forth voluntarily; it cannot be drafted. In attracting capital the utilities must compete with the securities issued by such businesses as industrial and manufacturing companies and with the bonds issued by the state and federal governments." Hunt and Legg, "Publicity Utility rates in Illinois: The Bell Cases," 50 Northwestern Law Rev. 40, 41.

In determining the going price of capital in the current market, consideration should be given to the fact that utility capital is secured in two broad categories. These are: First, borrowing, and second, sale of stock. Generally, money obtained by borrowing comes cheaper than through the sale of stock, and generally, there is a fairly well established ratio between the investment in stock and the amount which can be raised by borrowing. Art. 1124 prohibits a rate fixed upon the stocks and bonds issued by the particular utility, but in determining the percentage rate of return necessary to raise capital this article does not prohibit a general consideration of the two methods of raising capital and of arriving at a rate of return which is a composite of the two on the current market.

One expert for the company testified that the ratio of capitalization for this type of company should be 50.38% debt, 17.99% preferred stock, and 31.63% equity stock. An expert for

the Commission swore that good capital structure for this type of utility is 62% debt, 16.9% preferred stock, and 21.1% equity stock. The company expert says that returns of 4% on debt, 5.42% on preferred stock, and 12.5% on equity stock (for an overall weighted average of 6.95%) are necessary to secure investments. The Commission expert came out with an overall weighted average of 5.32%.

■ Before the rate-making body can properly fix a rate to be charged by a gas utility to its consumers, three essential factors must be determined. These are:

(1) reasonable operating expenses;

(2) present fair value of the property used and useful by the company in the public service;

(3) a reasonable net rate of return.

Upon a trial in the district court the trial court should determine these same three factors.

■ Earlier in this opinion we pointed out that where the attack upon a legislative act of the Railroad Commission is that it violates the Constitution because it is confiscatory, we would not "investigate the methods adopted by the Commission in fixing its rates, nor the motives or purposes which prompted such action." Railroad Commission v. Galveston Chamber of Commerce, 105 Texas 101, 145 S.W. 573. The Commission may have used althogether erroneous methods and an erroneous conception of the law but if it arrived at a correct rate—and the court will test this rate against its own finding of fact—then the rate should be sustained. The court is concerned only with the end result—the rate. For that reason, the summary judgment procedure will not normally be an appropriate vehicle for testing a rate order. Here the plaintiff alleged that the rate was confiscatory. Irrespective of how the Commission arrived at the rate, if it in fact meets the *court's* test of a fair return on fair value *as these are found by the court,* then the rate is nonconfiscatory.

Plaintiff's motion for summary judgment is based upon its claim that there is no genuine issue of material fact because the following undisputed facts are clearly established:

1. "* * * the rates fixed by the Railroad Commission and

here sought to be enjoined were based upon a rate base of only $154,288.55, being the book cost (after deducting depreciation reserves) as of December 31, 1952, of said Alvin plant instead of the fair value of said plant of not less than $230,000.00 as of December 31, 1952.

2.    (The Commission) "* * * gave no weight to any of the proper measures of value going to make up the fair value of plaintiff's Alvin distribution plant and fixed value solely upon the cost of the property less book depreciation.

3.    (The Commission) "* * * did not give an effective consideration to current construction costs or the present reproduction cost of said Alvin plant.

4.    (The Commission) "* * * did not give any effective consideration to the present condition of said Alvin plant—it being undisputed that said plant is in excess of 91 per cent of new condition.

5.    (The Commission) "* * * in basing rates on book cost, less book reserve for depreciation, ignored the effect of 15 years of inflation on the present value of the Alvin plant.

6.    "* * * the rates fixed by the Commission, when applied to Alvin plant operations for the years 1951, 1952, 1953, and 1954, yield less than a fair return on the present fair value of plaintiff's Alvin property.

7.    (The Commission) "* * * in basing rates upon book cost, less book reserve for depreciation, did not base rates upon the fair value of plaintiff's Alvin plant, as required by law.

8.    (The Commission) "* * * having ignored the statutory standard, is unreasonable and unjust as a matter of law."

Of the above, Nos. 7 and 8 are clearly not a recitation of facts but are conclusions of law. The form in which Nos. 2, 3, 4, and 5 are stated go to the methods and motives of the Commission and are not material. No. 6 is a statement that the new rate when applied to past operations would not yield a fair return. Since the new rates are prospective only this amounts to an argumentative statement of evidentiary material. So the allegation of fact upon which this summary judgment is sought and upon which it must be rested is contained in No. 1. That is that

the valuation rate base used by the Commission was $154,288.55 and that the true valuation rate base is $230,000.00.

The facts are uncontroverted that the Railroad Commission used the figure of $154,288.55. From the affidavits there is a fact issue as to whether the true figure should be $230,000.00.

■ It must be remembered that there are two variables here. There are affidavits filed demonstrating that there is considerable evidence available on the rate of return necessary to induce the investing of capital in utility stocks. This figure seems to fluctuate from time to time. It can be proved by expert testimony just as many other facts are proved in court by experts and there is a fact issue on rate of return made by the affidavits here. The Railroad Commission has determined a fair rate to be 6.12% which upon a valuation of $154,288.55 gives a return of $9,439.63. This figure the company claims to be wholly inadequate. Suppose the Commission to be wrong in both findings. A trial court might find that the fair value was $180,000.00 and a fair rate of return was 5.5% instead of 6.12%. This would support a holding that a yield of $9,900.00 was not confiscatory, and the new rate promulgated by the Commission will make an estimated yield of $9,439.63. Since these are all estimates of future yields anyway, the trial court would not be justified in striking down the rate.

We do not pass upon the method of treating depreciation since it is not briefed.

Upon a review of all the affidavits supporting both the motion for summary judgment and the contest to it, we have concluded that there are two genuine issues of material fact in the case at bar. They are:

(1) What is the fair value of the company's property used and useful in servicing the City of Alvin?

(2) What is the lowest composite percentage rate of re- which will induce the investment of adequate capital?

The trial court should make its own finding of fact based upon admissible evidence and test the new rate against its findings.

■ It is to be regretted that the legislature has not been more specific. The difference between a court's legislating and a court's

construing an ambiguous and vague statute is thin, indeed, and we would urge that the problem of determining the best accounting practices to be followed in evaluating a utility's property can be best determined through the use of legislation and not by the courts. See Kripke, "Uniform Accounts 100.5 and 107," 57 Harvard Law Review 433. It is the duty of the legislature to declare the law and of the courts to apply it. For the legislature to enact such vague statutes that the attempt of the courts to apply them produces what might be labeled judicial legislation puts an undue strain upon our governmental system. In defense of fifty years of judicial effort to determine the meaning of "fair value" it must be remembered that the courts cannot evade the issue. They must decide specific cases for one party or the other. The delegation to the regulatory body of legislative power to prescribe accounting practices is one solution if the regulatory body will be fair in the use of the power when delegated, and will bear in mind Mr. Justice Jackson's admonition that "bookkeeping is hardly an exact science." Perhaps the rigidity resulting from governmental regulation brings on a certain amount of hardening of business arteries and makes necessary the use of "symbols of certainty to express values that actually are in a constant flux."

Reversed and remanded.

Opinion delivered March 21, 1956.

MR. JUSTICE GRIFFIN concurring.

I agree with the opinion in so far as it holds that a summary judgment should not have been given, and in the reversal and remanding of the cause for further trial.

Opinion delivered March 21, 1956.

Rehearing overruled May 9, 1956.